Catron, Judge.
A principal question which lias been argued in this cause, on behalf of the plaintiffs in error, is, that the government of the United States has no power, by virtue of a treaty, to cede to individuals the property of a Sovereign State of the Union, although private property may be taken for public use, by making compensation theiefor; and that the treaties of 1817 and 1819, have ceded away the property of Tennessee, by giving lands to individual Indians.
This leads necessarily to the inquiry, what title the Cherokee Nation of Indians had to the land in controversy at the date of the treaties, and also what title had been vested in Tennessee?
It is contended, that the Cherokees never had any title *408 (o the soil, but that the same at all times belonged to North Carolina, the United States, and Tennessee: that North Carolina legislated in reference to the Cherokee?, as she did for other portions of her population, without pretending to treat with them as an independent nation: that the Indians were permitted to hunt upon the uninhabited territory, until the State had a use for it, when the same was sold without the least regard to any pretended title on the part of the Indians, who were tenants at suiferance. Previous to 1783, the character of the Cherokee title to the lands ceded by the foregoing treaties, and those previously ceded or conquered from them, was similar to that of ail the other tribes of Indians within tlie limits of the United States; to wit: a right of possession in the Indians, with the ultimate power in the Government to extinguish the same, as will be. seen by the case of Johnson vs. M’Intosh, reported in the 8th volume of Wheaton's Reports, which is the best examination within the knowledge of this court upon the subject, and to which, perhaps, nothing material could be added.
We will now examine the position, that North Carolina treated the Chorokces as citizens, and as having no right to any part of her soil. For the sake of argument, we will admit this to be true previous to 1783. North Carolina, then having (he right of soil and right of sovereignty, had the right to grant the lands loa corporation or an individual, by a legislative act, as she done in the case of a grant of 610 acres to the town of Nashville, and of 25,000 acres to Gen. Green; both of which statutory grants have received the judicial sanction of the courts of this country. Had not North Carolina an equal right to grant to the Cherokee Nation of Indians, a certain portion of her lands? That she had such right, if she saw fit to cxcercise it, cannot be denied. Did she make such grant by her act of 1783, ch. 2, sec. 5? The act provides,“That the Cherokee Indians shall have and enjoy all that tract of land bounded as follows,” &c. (including the Hiwassee District:) “And that the lands included within the aforesaid bounds, shall be, and are hereby, *409 reserved unto the said Cherokee Indians and their Nation forever.” The 6th and 7th sections provide, that said reserved lands shall not be granted to others, or the session of the Cherokees obtruded upon. If North Carolina had the exclusive right of soil, possessory and ultimate, and also the sovereignty of the country, here is a legislative grant equally solemn with those to the corporation of Nashville and Gen. Green. Such has been the doctrine of the legal men of North Carolina, and which doctrine leads to the inevitable result, that the act of 1783 conferred a fee upon the Cherokee Nation of Indians. The moment it is conceded, that the Cherokees were citizens of North Carolina, that they were in effect, represented, and that the State did legislate for them, it follows of course, the Cherokees were parties to the contract, and the legislative grant contained in the act of 1783, conveyed the fee in the lands; and so the supreme court of North Carolina has decided in a case growing out of the present treaties. Den on the demise of Eu-che-lah vs. Walsh, (3 Hawks. Rep. 155. Den on the demise of Yo-na-gus-tee vs. Coleman, (3 Hawks. 174.
Had North Carolina the right to legislate for the Cherokees, and claim the exclusive right to the soil within the above bounds? It is not believed she had. That she had the ultimate title, incumbered with the right to occupy the same on the part of the Cherokee Nation, is true; but that she had the right to exercise legislative power over the Nation, is negatived by her own acts. Hence the act of 1783, is, in its character, not even conventional in reference to the Cherokees, who were no parties thereto; nor did they pretend to derive title to their lands by virtue of this act of Assembly; they have asserted their right of occupancy by virtue of previous enjoyment of the country, for perhaps centuries. Truly the act of 1783 bound the citizens of North Carolina. Suppose'North Carolina had repealed this act, would th« Cherokee Nation have been affected in their title by*the repeal, and their possessory right to the country been destroyed? It cannot be pretended. The citizens of North Carolina
*410 would have been at liberty to intrude upon the Indians,, but this would have been the only material effect of the repeal. Had North Carolina the power to repeal the act 0f 1783'? If the argument be true, that the Cherokees were a part of her citizens, for whom she could legislate, then the grant would have been in fee, and stood upon the footing of every other contract; which the legislature could not violate under the constitution of the State, and would fall within the doctrine held by the supreme court of the United States, in the cause of Fletcher vs. Peck. The Cherokees were not represented in the legislature of North Carolina, having a government of their own; the statute only operated upon the citizens of North Carolina, and it could be repealed at their pleasure; the law recognized the right of occupancy in the Cherokee Nation in strong terms; yet we think, vested no title in the Indians, other than they had before its passage.
It is but just, when differing with the supreme coart of North Carolina, filled with men distinguished for talents and learning, that we should state some of the reasons leading to the difference. That court has decided that the act of 1783, ch. 2, sec. 5, vested in the Cherokee Nation a title in fee to the lands south of Tennessee river, and north of the 35th degree of north latitude.
We contend, that no fee was taken by the act; that N. Carolina had no right to legislate for the Cherokees, without first incorporating them into the body politic. They were not represented, nor was the grant accepted by them. Was it accepted? The act of 1783 opened John Armstrong’s office for the location of lands north and west of the Tennessee river, a great portion of which lay within the Cherokee boundary; this attempt to survey the lands the Cherokees resisted; the melancholy war that followed, will long be remembered by the people of Tennessee. There^s hardly ■ a family of the early settlers, but can number amongst the slain some of its members. So effectually did the Indians resist, as not only to prevent the lands entered within their territory from being *411 ‘settled, but they were very near expelling the settlers in West Tennessee altogether from the military district. By the treaty of Holston, 1791, their boundary was the surveyors continued to enter upon their country, and war again broke out; which was not ended until 1795, by another treaty. The Cherokees by these treaties retained the land, to the extent of their claims, and continued to retain one of the finest countries upon the globe until 1806, when the Duck and Elk river country were ceded, and in 1817, the balance of the country north of the river, by the first treaty now under consideration. Thus North Carolina and her grantees, were successfully resisted, to the ruin of very many of the latter, who had fallen into the delusion that the act of 583 would presently be submitted to by the Cherokees, and upon such supposition, vested their whole capital in the £10 lands.
The theory of legislating for the Cherokees, which is supposed to have been assumed by North Carolina, was visionary. The treaty under consideration admits the Indians not to be citizens, and the 8th article provides the mode of their naturalization.
The Cherokees in matters of government, were a dependent people, but governed by laws of their own, and having a country of their own, which they did not profess to hold from North Carolina by virtue of the act of 1783, their ancient warriors would to this day, with savage independence, scorn at the mention of such a grant, and refer you to the great spirit for the source of their title, and to the graves of their fathers, and their rusted arms, for its perpetuation. Such North Carolina found the Cherokee title, and such, in our humble judgment, she leftit. Notwithstanding the act, shejmust have incorporated the Cherokees into the government, and caused them to be represented,before she could legislate for them; this was not the case in 1783.
That North Carolina, by her legislative acts, had the right to grant lands within the Indian boundary to her citizens, and that such grants were binding between the *412 and the grantees, is admitted; yet this did not af-feet the Indian title.
Jf the decisions of our mother state, North Carolina, furnished the true construction of the act of 1783, what would be the consequence? The Cherokees had a legislative grant in fee, and just such title as General Green had. Suppose General Green had conveyed his 25,000 acres to the United States? They' would have the fee. The Cherokees have ceded all their title to the United States; of course they have the fee.
The act of 1789, transferred the fee from North Carolina to the United States; the act of 1806, transferred the fee to Tennessee, but expressly reserving the Indian title. This title, such as it was, the Cherokees transferred to the United States, as grantees by the treaty of 1819. If our construction is right, so soon as the Indian title was extinguished, the sovereignty (Tennessee) to which the incumbered fee belonged, or an individual of that sovereignty to whom it had been granted, took the land dis-incumbered; because the Indians had no permanent interest in the soil, and nothing passed from them: the right of occupancy was a usufructuary privilege subject to extinction. This doctrine applies to all ordinary case.s of Indian occupancy; but if the Cherokees had the fee instead of the occupant right, of course they passed the fee by the treaty of 1819 to the United States; nor could it vest in Tennessee upon the familiar principle, that where A conveys to B certain lands by a deed in fee, having a defective title, and aftewards gets in the fee, it shall inure to the benefit of B the grantee. But suppose A, in the grant, expressly declares that nothing in the grant contained shall affect the title of C, whose smaller grant lies within the boundary that A conveyed, then A has granted to him the title, of C in fee; will this grant inure to the benefit of B? The conveyancer can give but one answer, that it will not.
In 1798, what is now Tennessee, was ceded by North Carolina to the United States, clogged with the condition, that the North Carolina land warrants and claims unsat *413 isfied should be extinguished, and the balance of the territory was to be disposed of by the United States for the joint benefit of the Union. The U. States having the right of soil, the sovereignty and possession, of the country, in 1791 made the treaty of Holston with the Cherokees. By this treaty, boundaries were settled, friendship established, protection guaranteed by the United States to the Cherokee nation, the mode of intercourse, and reparation for crimes by the people of each country upon the other, fixed. By the second article, the Indians stipulate that they would be under the protection of the United States only, and that they would not hold any treaty with any foreign power, individual slate, or with individuals of any state. To more effectually secure the Cherokee nation in the lands not ceded by the treaty, the seventh article provides, “The U. States solemnly guarantee to the Cherokee nation all their lands not hereby ceded.” Strong provision is made in the treaty to keep off intruders upon the territory guaranteed. What was the effect of the above guaranty? To say the least, it went to secure against the United States and their citizens, the occupancy of the soil within the Cherokee limits, and secured the possession of the country exclusively to the Cherokee nation. To the validity of this treaty no objection has been, or can be raised; it has been recognized and confirmed in various subsequent treaties between the United States,and the Cherokees.
The title of the Cherokee nation to the lands ceded by the treaties of 1817 and 1819, previous to the cession, was then simply this: the right to occupy, use and enjoy them in exclusion of all others, until such right was obtained from them by the United States, the extinction of the nation, or conquest; the United States alone, by the treaty of Holston, had the right to extinguish the Indian title.
By the compact of 1806, ch. 10, the United States ceded to the state of Tennessee, all their right and interest to the vacant and unappropriated soil within the state of Tennessee, east and north of certain bounds, incumbered with two conditions; first, that the North Carolina war *414 rants outstanding should be satisfied out of the same; and secondly, that nothing in the act contained should afiect the Indian title. The lands in the Iliwassee district are a part of those ceded by the act of 1806, and were then, and until the treaty of 1819, incumbered with the Indian title.
As no warrant holder is before the court, it is useless to say any thing of the first condition. Just such title, then, as the United States had to the lands within the Cherokee nation at the passage of the act of 1806, ch. 10, Tennessee acquired.
The United States had the power to transieran estate in the lands ceded by the act of 1806, but subject to the occupancy and enjoyment of the Cherokees, as was adjudged in the case of Fletcher and Peck.
Having seen what title the Cherokee Nation had to the lands ceded, and what title Tennessee acquired by the cession of 1806, we will next inquire what title was communicated by the treaty, to the reservees. The Indian Nation was the owner of the possessory right, and all the subjects of the Nation joint tenants of the whole territory ceded. The reservee, by the treaty, took in severalty, directly from the Nation, the Indian title, as his reasonable portion of the ceded territory, because he wished to continue to reside there, having a house and improvements from which he was unwilling to remove; hence he reserves his reasonable portion, a mile square, including his residence and improvement in the centre as near as may be. Here, then, is reserved the Indian title to a mile square within specific bounds. Suppose there had been reserved one mile square, or ten miles square, in the centre of the ceded territory, had not the Indians a right to do so? This is undeniable, even had the Indian Nation continued to govern it; but the inconvenience is much less, where the unincumbered sovereignty is transferred to the United States over the lands reserved, and the reservees become citizens, as in the present instance.
In this case, Pathkiiier prosecutes his ejectment; has *415 he a right vested in him to sustain it? This is merely a possessory action; Pathkiller has the right of possession, is within the sovereignty and jurisdiction of courts, a citizen of Tennessee, and has clearly a right to sue and recover, Rad he taken his reserve pursuant to the treaty: hence the constitutional question so strongly urged, cannot fairly arise in this cause. To the reserves lawfully taken by the treaties of 1817 and 1819, Tennessee never has had the right of possession; consequently, she could not communicate it to the purchaser from her.
Tennessee herself, claims under the treaty, lands to the value of perhaps a million of dollars, to which extent it is admitted the treaty is valid; but the reserves, it, is contended, are void. These treaties were made with all due formality; no state or individual had any right to treat with the Cherokees according to the express stipulations of the second - article of the treaty of Hols ton, which power was alone reserved to the government of the United States. What right of a legal character has Tennessee to complain, that the title.to a certain mile square, within the bounds of the ceded territory, was not vested in her? Not anymore than she has to object to the non-extinguishment of the Indian title to the lands lying in the same neighborhood' within her chartered limits, and now occupied by the Cherokees. What rights to the possession of these lands Tennessee has acquired, are by and through the treaty, and she is compelled to conform to its terms in the disposition of such possession; the treaty is an entire instrument, and it does not lie in the mouth of Tennessee, more than that of the government of the United States, to say, we will adopt all those parts of the treaty beneficial to us, and reject such parts as are prejudicial.
This is not the construction given to the treaties by the legislature of Tennessee in their acts of 1817, ch. 52; 1819, ch. 59, sec. 1; 1819, ch. 60; 1822, ch. 27; 1825, ch. 12; and 1825, ch. 41; by which, these treaties, the lands acquired, and those reserved; have been acted upon nnd recognized; these acts contemplate a compli- *416 anee with the treaties, and are characterized by that good faith, which we hope Tennessee will ever observe jn the performance of her contracts with neighboring powers, be they civilized or savage.
Suppose these treaties had been unconstitutional and void, as against Tennessee; has she not recognized and confirmed them? By the various acts above referred to, particularly those of 1817, ch. 52, and 1819, ch. 59, she has caused to be laid off and sold, most of the lands acquired by the treaties, excepting the reserves lawfully taken. The lands lying north of the river Tennessee, were appropriated by the act of 1817, ch. 52, upon which warrants were entered; at least, the greater portion of them that were valuable, and the balance were offered for sale, first at 121 cents, and then at one cent per acre,.by acts of assembly recited above; yet it is seriously urged upon this court, that Tennessee is dissenting tc the treaties as unconstitutional; why? because they are void? this is not contended for; but it is said they are void in part; that is, for all that portion of the consideration, which has fallen to the lot of Tennessee to pay, (if a part of the territory ceded can deserve the name of a payment,) and for that portion which she has disposed of, the treaties are valid. A material part of these treaties, of course, was the consideration paid to the Cherokee nation for the Indian title to the land ceded; and a very material portion of this consideration, was the reserves to the Indians who had become cultivators of the soil. Take this part of the consideration from the reservees, and the treaties are violated. What is the consequence? They are annulled by reason of their violation, and the Cherokee Nation entitled to re-occupy all the lands ceded. Such is the well settled international law, as recognized by every civilized country , (Vattel, B. II. ch. 13, sec. 20, 2;) and recognized in this court, in Cornet vs. Winton, 1826, in Judge Catron’s opinion.
Let it be admitted that none of the above reasons exist *417 ed, still the treaty is valid, and all the reserves for life and in fee, were rightfully and constitutionally made.
By the treaty of Holaton, the United States ed to thémselves the exclusive power of treating with the Cherokees. In 1806, the United States ceded to us, the lands acquired by the treaties of 1817 and 1819, with many others north and east of the Congressional reservation line, out of which we were to satisfy the outstanding land claims against the State of North Carolina, which were to be located in the State of Tennessee.
To nearly all the country ceded to us by the act, except that part acquired by the treaties of 1817 and 1819, the Indian title had been extinguished. The act of 1806, has this proviso in it: “That nothing contained in this act shall be so construed as to affect the Indian title, or to subject the United States to the expense of extinguishing the same”
In 1807, (ch. 42,) Tennessee made an appropriation for the extinguishment of the Cherokee title within our chartered limits; and at the same session, passed a resolution having in view the same object; but it was impossible to accomplish this until 1817 and 1819, when the title was extinguished by the United States, as the agent of Tennessee, so far as the ceded territory lay within our chartered limits. Of the charge for the extinguishment, Tennessee bore no part, except the reserves to the Indians. Was this a reasonable portion of the consideration paid for the Indian title on the part of Tennessee? The agent was unlimited by the principal (Tennessee) in the amount to be paid to the Cherokees, for the extinguishment of their title; and the principalis bound by the act of the agent. Suppose this had been otherwise, and the agent limited in the amount to be paid, but had exceeded the authority and promised more; what should Tennessee have done? Disaffirmed the contract made by the treaty, because of want of authority in the agent to bind her? Did she do this? By no means. She took the benefit of the treaty. What is the consequence? it is a universal rule, that where the agent exceeds his au *418 thority, if the principal takes a benefit under the con- , , , i /• . , tract, he is bound, and cannot aiterwards be heard to ob-jecj. (-}le want of authority in the agent. This princi-pje 0f common justice has been recognized as equally true in every civilized community, and is equally applicable to the sovereign stale, and her humblest citizen.
Let us apply the principle to the common concerns of men; A authorizes JB, his agent, to purchase for him 1000 hogsheads of tobacco, but B, when he gets into market, purchases for A, 1000 bales of cotton, which are shipped to,and received by A, sold, and the proceeds appropriated to his own use; then C, the vender of the cotton, sues A for the stipulated price, who defends himself, for want of authority in B to make the contract. Would it not be a good answer that A had affirmed the contract by receiving the benefits thereof? All would agree that A was bound to pay the stipulated price.
We will state the present case, and see if the same principle applies. By an act of 1806, certain territory is ceded to Tennessee by the United States, by which act it is stipulated, “that the Indian title shall not be affected by the- cession; and that the United States shall not be at the expense of extinguishing the same;” that is, Tennessee shall be bound to pay this charge. Here the Government of the United States is the agent through which Tennessee is to extinguish the Indian title; to this purpose, in 1817, that government appoints commissioners to execute the trust, who proceed to extinguish a part of the outstanding title, and make a provision, which, in its tendency, in all probability, would have been the means of procuring the residue presently. The treaty is producing the desired effect more rapidly than the negotiators themselves had anticipated. Early in 1819, the Cherokees apply to the United States to be relieved from the consequences of the treaty; to accomplish this, they agree to cede a large body of their lands, including all to which they claimed title lying within the chartered limits of Tennessee, save a fraction, the size of a county. Both these treaties are presented to the President and Senate *419 of the U. States, receive their sanction, and are ratified; Tennessee forthwith proceeds to survey and appropriate by legislative acts, at least thirty-nine out of every forty sections of the lands acquired by her in virtue of the treaties; the most valuable parjt of the lands are sold, the money received and appropriated, the country is filled up, sustaining a population of some 40 or 50,000 inhabitants ; is holden from seven to ten years without complaint on the part of Tennessee, that the United States, through her commissioners, exceeded her authority by paying too high, with the means of Tennessee, for the lands; indeed, such a charge would have been ridiculous, considering the trifling quantity reserved, compared with the whole quantity acquired. Is it possible to contend, that Tennessee, at this day, can come forward and disavow the act of her agent for want of authority? As this would not be allowable in a merchant dealing for a few bales of goods, so will it not be permitted in a sovereign state, where a million has been acquired and appropriated under the contract. \
It is but justice to the counsel foi¡ the plaintiff in error to state, that they avoided saying any thing directly upon this point of legislative recognition, and we can hardly doubt, that it did not occur to the members of the legislature at their last session when the question was discussed in that body; if it had, we feel some confidence they would have come to a similar result with this court, and supposed themselves bound by former legislation equally with the courts of justice. Treaties made without authority have been of common occurrence, and are not binding upon the sovereign power until ratified expressly or tacitly. A tacit ratification is inferred from any act done by the sovereign, which is justly presumed to be taken in virtue of the treaty, and which he could not take, if he did not consider it concluded and agreed upon; as if public ministers conclude a treaty of peace without the authority of their sovereigns, if one of these cause his troops to march through the territories of his recon- *420 died enemy, he tacitly ratifies the treaty of peace. (Vat. B. 2, ch. 14, sec. 208.
jt bas been insisted that the rules of international law, cannot be made to apply as between Tennessee and the United States; that the rights of Tennessee and the powers of the United States rest upon compacts, binding the parties according to the rules of the common low; that they differ not in principle from ordinary contracts between man and man, and must receive the same common law construction. Without examination, let us grant the truth of the argument, and answer it, applying the rules by which it is supposed to be alone governed. By the laws governing principal and agent, in reference to third persons, we find the right claimed by Tennessee to avoid the contract in part, utterly indefensible, after having appropriated thirty-nine parts out of forty of the property acquired, and this expressly in virtue of the treaties, as her legislative acts show. An assent so strong as this in affirmation of the act of the agent, has not been found in any book by this court, (Paley on Agency 143, 238, &c. The acts of the agent have been explicitly affirmed by-half a dozen different legislatures; but were this otherwise, the agent was not limited in the price to be given, and prima facie, paid only a fair consideration out of the property of Tennessee: Hence, take it either way, and the United States, as agent for Tennessee,had the power to dispose of the property of Tennessee to a reasonable amount, as a consideration for the lands acquired.
We have given this part of the subject much more consideration than in our judgment it deserved, which we were induced to do at the solicitation of the counsel and agent for the Stale, who presented us with one of the arguments made in our last legislature, upon which was adopted resolutions, arraigning in effect, the correctness of the decision in the cause of Cornett vs. Winton.
The argument has been relied on by the State’s counsel,as containing the substance of the reasons ofhis client, as expressed in the legislature, why the decision given in )Vinton’s case should be revised and altered. It assumes *421 that the Government of the United States, cannot take the property of one individual for private purposes, and dispose of it to another individual, in a contract between the latter and the United States.
As no such principle is involved in the present controversy, or formed the grounds upon which the writer decided the cause of Cornett vs. Winton, it is useless to examine the merits of the argument, which has no bearing upon any of the legal points arising in this cause.
We have carefully reviewed all the reasons that led to that decision, and imagine that the members of the General Assembly, in the busy scene of legislation, only took a broad and statesman-like view of the treaties, overlooking some of the local laws of their predecessors upon the subject; be that as it may, we cannot think with them. Thatthe resolutions were intended to dictate to this court, the course of future decision, we will not suppose, as this would be an attack upon the independence of the Judiciary.
The arguments presented are able; and whenever a case shall arise in Tennessee for their application, no doubt they will be referred to as throwing much light upon the subject to which they apply; but to the present cause, with all due deference to the opinion of others, we think they have no necesssary application.
The reasons that led to the opinion of Judge Catron in the cause of Cornett vs. Winton, are recapitulated in this, substantially; nor has he seen any thing in the arguments which convinced the General Assembly of his error, sufficient to bring his mind to a similar conclusion.
Having disposed of the constitutional objections, we will next proceed to examine some of the other questions made in the cause. To entitle Pathkiller to the land in controversy, five things were necessary: 1. That he was the head of an Indian family; 2. That he resided within the ceded territory; 3. That he had an improvement; 4. That he resided upon the improvement at the time required by the treaty; and 5tb. That he gave notice to the agent of his intention to become a citizen, or had his *422 name registered. This done, and Pathkiller had vested m him 040 acres in a square, including his improvement jn centre near as might be. In such case, the commissioners had no power to sell the land by the act of 1819, ch. 59, the 1st section of which expressly prohibited the sale of reserves.
The material point in this cause is, was it requisite that Pathkiller should have resided on the improvement, locating the reserve, at the time the treaty of 1819 was made.
By the 2nd article of the treaty of 1819, it is provided, “that the United States agree to allow a reservation of 640 acres to each head of an Indian family residing within the ceded territory, who chooses to become a citizen of the United States in the manner stipulated in said treaty.”
Amongst the various constructions contended for upon this article, it is insisted, that the words “m manner stipulated in said treaty” refer only to the mode by which the re-servee was to notify to the agent his intention of becoming a citizen, which was was to he governed by the 8th article of the treaty of 1817, but in its other provisions, the 2d article was independent of the 8th, and that every head of an Indian family, residing on the ceded territory at the date of the treaty, was entitled to 640 acres, without having had any improvement; that a different construction of the 2d article would cut off a great majority of the heads of Indian families from their rights to reserves, because the much greater portion resided in villages, and had no improvements. By this construction, every reservation was in fee; no object existed to give locality to the land reserved; no particular form to the land is required; no residence on it was necessary at any time, and no removal, a forfeiture. The only acts required, were the registry of his name with the agent, and an election of the land by the reservee. This court apprehends, that the 2d article of the treaty of 1819 refers to the whole 8th article of the treaty of 1817, and adopts every provision of the latter treaty relating to reserves; and that the whole of both treaties must be taken togeth *423 er, and construed as one instrument in the consideration Ox this Subject*
The 8th article of the treaty of 1817, stipulates, that each head of an Indian family wishing to become a citizen of the United States, shall have a reservation of 640 acres, to include his improvement in the centre near as may be, in which the reservee shall have an estate for life, with a fee simple to his children, reserving to the •widow her dower; provided, that if the head of the family should remove from the reserve, it should revert to the United States, or in other words, the reserved title be forfeited.
It is contended, and so the circuit court instructed the jury, that a residenee upon the land reserved at the date of the treaty, was not necessary; that if'possession was taken at any time before the first of January, 1820, the time when the Indians surrendered possession of the country, the treaty was complied with, and the reserve valid.
That the reservee must have been the head of an Indian family at the date of the treaty, and that the improvement must then have been already made, is sufficiently clear, because it is directly expressed; and we think, that residence upon the improvement at the date of the treaty must be as certainly inferred. If the head of the family removed from the land, it was to be forfeited, says the 8th article, and the improvement was to be paid for by the 2d article of the treaty of 1819. By the 3d article, there are granted thirty-one reserves in fee-simple, of 640 acres each, in a square; these reserves were made to persons who the agent certifies, had with few exceptions, long resided upon the lands reserved, were persons of industry, and capable of managing their own affairs. “The reservations are made on the condition, that those for whom they are intended, shall notify in writing to the agent for the Cherokee Nation, within six months after the ratification of this treaty, that it is their intention to continue to reside permanently on the land reserved.” Vide the 3d article. The recited *424 clause is an independent provision, and we are strongly inclined lo think, applies to both the 2d and 3d articles. The 3d article, by its terms, purports to be a continuation 0f the 2d. “It is also understood and agreed,” &c. that the 31 persons named, have their reserves in fee, and clearly contemplated that the reservees referred to, then resided upon the lands reserved. The 3d article grants eleven 640 acre tracts, “the persons for whom they are intended, not residing upon the same.” From these provisions, taken in connexion with the 8th article of the treaty of 1817, the intention of the framers must have been to provide for such as were in actual possession at the time the treaty was made. There are other reasons leading to this conclusion. The terms employed referring to residence, heads of families, and improvements, are all in the present tense, taking the 8th and 2d articles of the treaties of 1817 and 1810 together. The Indian country was property in common, and actual residence the only evidence of individual property in any particular portion of the soil. If the construction given by the circuit court were the true one, the United States and Tennessee would have been subject to the grossest impositions; the prime lands might have been seized upon by reservees, pretending their improvements were at hunting camps and abandoned shelters. An Indian improvement being an object of little notoriety, and not certainly.to be ascertained but by actual residence, innumerable disputes must have arisen as to the right to these slight improvements upon choice spots of land, which were unoccupied at the time the treaty was made; and which controversies, there was not any mode of settling provided by the treaty. One object of granting the reserves, was to incorporate a portion of the Indians who no longer relied upon hunting and game for subsistence into our society, make them an agricultural people by securing to those engaged in husbandry, their homes; for the hunters who had no homes, but temporary camps, it was idle to provide; they were too indolent to cultivate the soil, had no experience, and would have starved on the *425 most fertile spot, had their support depended upon manual labor. To one of these wandering men the land could have been of no service, because he could neither sell or remove from it; the idea that he would submit to be governed by our laws, and live amongst white neighbors, could hardly have occurred to the commissioners, or the Cherokee chiefs; it was those who had little farms or patches, at which they resided, that were provided for, and who, from their habits and pursuits, were somewhat qualified to reside amongst us, by mingling their labor with the soil; they had acquired by common consent of the nation, an individual property in that particular spot, which the claimant was unwilling to leave; he agrees to become a citizen, upon which condition he is permitted to remain.
The treaty of 1819, was made on the 27th of February; the Pathkiller removed to the land in controversy in April or May following, having previously resided at a place called the Peach Trees, several miles off. We think he had no right to claim the place in controversy as a reserve, for want of residence thereon at the date of the treaty; that the judgment below should be reversed, and the jury so instructed upon another trial.
. The cause of Grubbs’ lessee vs. M’Clatchy, depends upon the same principle. Grubbs was a neutral man from Pennsylvania, who, about 1808, married an Indian woman by whom he had children; his wife had left him and married an Indian; Grubbs resided, before the treaty of 1819, at a place called Hambright’s or Clubfoot’s bend, several miles from the place in dispute. In July, 1819, he removed into the woods at this place, put up a camp, took his slaves there, cleared lands, and claimed the reserve. He registered his name for a reserve the 29th June, 1819, before he - took possession, having previously registered for two other places described in the registry. After the land sales, Grubbs left the place improved, and the jury found he had abandoned it,, and judgment was given for the defendant, which we think should be affirmed. Morgan’s lessee vs. Fowler, is governed by' the same *426 principle. Morgan had married an Indian woman, and had children; whether he resided at Knoxville or in the Nation, is doubtful; on the 25th of June, 1819, he registered his name with the agent. In December, 1819, he made the improvement claimed, and removed to it; a verdict and judgment in this case was given for the defendant, and we think correctly. M’Intosh vs. Cleveland we . have examined, and think his was a clear case of abandonment, voluntarily, and that the jury found correctly. The judgment should be affirmed.
Whyte, J.
The constitutional question raised in this case, and discussed at so great length at the bar, and after-wards on the bench, having been decided by the concurrence of a majority of the members of the court, renders it altogether unnecessary for me to say any thing on that point. A few observations upon the treaties of 1817 and 1819, will be submitted. The opinions delivered disagreeing in their construction of these treaties, and producing differing results in this cause, requires my view to be given to effect a decision in this court.
Pathkiiier, the defendant in this court, and the lessor of the plaintiff below, claimed a reservation under the treaties of 1817 and 1819, of 640 acres of land, with a life estate therein to himself, and a reversion in fee simple to his children, out of the lands surrendered by these treaties to the United States. He was the head of an Indian family; and on the Register of the life interest reservations, in the office of the United States’ agent for the Cherokees, is the following entry: “ 1818; June 14th: Pathkiller, a native, five in family, on the main Tennessee river, about two miles and a half above the mouth of Sweet Water creek; there is a ferry on the place. Given under my hand and private seal, there being no seal of office, this 2d September, 1826. H. Montgomery, U. S. Agent for the Cherokees. (l. s.)”
The above entry appeared in evidence by a copy taken under the act of Assembly of 1825, ch. 25, sec. 1.
Pathkiiier moved to this reservation, (which is the land *427 in dispute,) in April or May, 1819, having occupied it by his tenant, Caves, from 1817. He also produced on the trial, the plat of a survey made by Houston and strong, who were appointed by the United States to survey such claims. Pathkiller was dispossessed at Blair’s (the plaintiff in error) instance, by a writ from a circuit Judge, issued under the act of 1819, ch. 59, sec. 13. Blair was in possession at the commencement of this suit: Pathkiller had other places occupied by his family or tenants, one of which was called the “PeachTrees.”
The points made in argument are, whether under thése treaties of the 8th July, 1817, and 27th February, 1819, the head of an Indian family is not bound to take his reservation at the place on which he himself resided at the date of the treaty? Or, if he has one place occupied by himself, another by his family, and a third by his tenants, can he select which place to register his reservation, and at what time must this registry be made?
These two treaties being in pan materia, are to be construed together. The reservations of land given by them to the Indians, are of two kinds. The one is an interest for life to the reservee, with a reversion in fee simple to the children of said reservee, and dower to the widow. This reservation is more especially dependent upon the 8th article of the treaty of 1817, but is affected by the 2d and 7th articles of the treaty of 1819. This kind of reservation is given to each and every head of an Indian family residing on the east side of the Mississippi river, and on the lands that were then, or might thereafter be surrendered to the United States.
The other kind of reservation gives a fee simple to the reservee, and points out the persons taking by name; specifying the reservations, either, as in some, by particular localities, or as in others, to include their improvements, which are to be as near to the centre as possible; expressing also the state or territory in which these improvements lie. This kind of reservation is dependent upon the third article of the treaty of 1819, and the schedule thereto annexed.
*428 Pathkiller’s reservation is of the first kind. The eighth article of the treaty of 1817, is in the following words: «and to each and every head of an Indian family, residing 0n the east side of the Missisippi river, on the lands that now, or may hereafter be surrendered to the United States, who may wish to become citizens of the United States, the United States do agree to give a reservation of six hundred and forty acres of land in a square, to include their improvements, which are to be as near the centre thereof as practicable, in which they will have a life estate, with a reversion in fee simple to their children, reserving to the widow her dower, the register of whose names is to be filed in the office of the Cherokee agent, which shall be kept open until the census is taken as stipulated in the 3d article of this treaty. Provided, that if any of the heads of families, for whom reservations may be made, should remove therefrom, then and in that case, the right to revert to the United States; and provided further, that the land which may be reserved under this article, be deducted from the amount which has been ceded under the first and second articles of this' treaty.”
It is contended in argument for the plaintiff in error, that in this article, the words “United States do agree to give a reservation of six hundred and forty acres of land in a square, to include their improvements, which are to' be as near the centre as practicable,” have reference to the state of things as they existed at the time the treaty was made. That the improvement on which the head of the Indian family then resided, is the meaning of the treaty, and that other improvements occupied by his family or tenants, are excluded, as being naturally less the objects of the owner’s choice, and less notorious in establishing their locality, should that purpose be rendered necessary; and it is further argued, that the head of the Indian family taking his reservation on the improvement at his residence, is a condition of the gift or grant, which not being complied with, renders the registry in the agent’s office null and void.
*429 The soundness of this argument, will be best tested by bringing into view the principal object of the contracting parties. That was, on the part of the United States to give, and on the part of the Indian to receive, a portion or settlement of land on which to live, on which to make his bread and support his family. This was pursuant to the expressions of the preamble of the treaty, the Cherokees, or a portion of them, having expressed an anxious desire to engage in the pursuits of agriculture and civilized life, in the country they then occupied. Thus, the great object of the parties was a settlement of land, whereon the Indians might live and raise aad support their families, by and in the pursuits of agriculture, and become partakers of the advantages flowing from a civilized life. Whether this settlement or portion of land was partly cleared, or wholly uncleared, having no improvement on it whatever, was only a secondary object with the contracting parties, whose views, especially on the part of the United States, are not to be measured by those often entertained by individuals in a coutract of sale about a particular specified spot or tract of land, and whose thoughts are not to be deemed as having once glanced at the higgling terms upon which contracts of the latter class often turn. Such as these never, entered into the minds of the commissioners of the U. States. The true meaning in this article, of the expression “to include their improvements as near the centre,” &c. is nota condition to defeat the head of an Indian family, if such improvement is found not to exist upon his reservation; but its true meaning is an intended benefit and advantage to the Indian. It is a part of the treaty introduced in his favor, and it may be reasonably supposed, that he hath pitched upon this spot, containing his improvement, in preference of all others; that it hath become endeared to him from the usages of residence and cultivation, and by these means holds a place in his affections superior to all others. The provision “to include his improvement,”is a benefit to the Indian, but not a “sine qua non” to the accomplishment of the great objects contemplated by the *430 in its preamble. True, it is a facility, in hasten- . , , .. , ing ms advances to a participation m the advantages of civilized life, but it may be dispensed with, at the reser-vee>s own option, according to the established rule in the construction of instruments, that “every one may waive the benefit of a stipulation in his favor.”
H. L. White and Lea, for plaintiffs in error.
Jarnigan and R. G. Dunlap, for defendant.
My opinion therefore is, that Pathkiller might have selected the Peach Tree improvement, for his reservation, or any other of his improvements, or any other spot altogether unimproved, if not interfered with by an older right, without transgressing or violating the treaty. It was nota matter of any moment whatever to the United States, on what part of the ceded territory he took his reservation.
Note. Those parts of the opinion’ of Judge Catron which relate to the title of the Indians to the land within the ceded territory, and the validity and binding effect of the treaties oí 1817 and 1819, were concurred in by the court. But his construction of the 8th article of the treaty of 1817, taken in connection with the second and •seventh articles of the treaty of 1819, was not. Upon the construction of these articles, Judge Peck concurred in the opinion of Judge Whyte.
Judgment affirmed.